**POULOS LOPICCOLO PC**
Joseph LoPiccolo
John N. Poulos
112 W. 34th Street, 18th Floor
New York, NY 10120
212-946-2751
lopiccolo@pllawfirm.com
poulos@pllawfirm.com

**NAGEL RICE, LLP**
Diane E. Sammons
Bruce H. Nagel (*Pro Hac Vice* Admission to be sought)
Randee Mattloff (*Pro Hac Vice* Admission to be sought)
103 Eisenhower Parkway
Roseland, New Jersey 07068
973-618-0400
dsammons@nagelrice.com
bnagel@nagelrice.com
rmattloff@nagelrice.com

*Counsel for Plaintiffs and those similarly situated*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRIAN SCHIANO and DAWN SCHIANO On Behalf of Themselves and All Other Persons Similarly Situated, | Case No.: |
| Plaintiffs, | |
| -against- | **COMPLAINT** |
| GENERAL MOTORS, LLC, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiffs, Brian Schiano and Dawn Schiano, by their attorneys, Poulos LoPiccolo PC and Nagel Rice, LLP on behalf of themselves and all others similarly situated, make the following allegations on personal knowledge and information and belief:

## I.   <u>INTRODUCTION</u>

1.      Plaintiffs bring this action against General Motors, LLC ("Defendant" or "GM") for and on behalf of themselves and a class composed of all purchasers or lessees of 2007 to 2016 Chevrolet Traverses, Buick Enclaves, GMC Acadias and Saturn Outlooks that were marketed and sold with incorrect EPA-fuel economy estimates (the "Class Vehicles").[1]

2.      For years (as far back as 2007), Defendant advertised that the Class Vehicles were EPA-rated up to 17 miles per gallon ("mpg") in city driving and 24 mpg on the highway, resulting in a combined rating of up to 19 mpg.

3.      These ratings, however, were false.  As detailed in a memorandum circulated by GM to its authorized dealerships, GM admitted that certain 2016 Class Vehicles are actually EPA-rated at 15 mpg in city driving and 22 mpg on the highway, resulting in a combined rating of 17 mpg.

4.      Defendants admitted that the EPA fuel economy ratings and advertising statements overstated the actual numbers by as much as 2 miles per gallon in 135,000 2016 GM vehicles it sold.  *See http://www.usatoday.com/story/money/cars/2016/05/20/general-motors-fuel-economy-compensation-crossover-2016/84659202/*

5.      Plaintiffs Brian and Dawn Schiano leased a 2016 GMC Acadia whose EPA fuel economy ratings and advertised fuel efficiency numbers were inaccurate and higher than they would have been had proper testing procedures been followed by GM.

6.      This action seeks relief for the injuries sustained as a result of GM's material

---

[1] Plaintiff reserves the right to amend or add to the vehicle models included in the definition of Class Vehicles after conducting discovery.

misstatements regarding the Class Vehicles fuel economy ratings used in the marketing and sales of certain GM vehicles sold in the United States by the Defendant.

7.      Plaintiffs and the Class and Subclass Members have been damaged by GM's misrepresentations of the incorrect fuel economy because they were misled into purchasing or leasing a vehicle of a quality different than promised and paying higher fuel costs than would have otherwise been paid.

## II.      PARTIES

8.      Plaintiffs Brian and Dawn Schiano reside in Oceanside, N.Y.  In January 2016, Plaintiffs leased a new 2016 GMC Acadia from King O'Rourke Cadillac Buick GMC in Smithtown, NY.

9.      Plaintiffs saw advertisements and the EPA fuel economy window sticker that represented a certain number of miles per gallon before they purchased the Acadia in January 2016.  Based on their review of the advertisements and the window sticker when they purchased the GMC Acadia, Mr. and Mrs. Schiano believed that the vehicle would achieve and they would receive the stated MPG.

10.      After entering into the lease of the vehicle, however, Mrs. Schiano observed that the GMC Acadia could not achieve the fuel economy touted in the advertisements and window sticker she saw.  In fact, compared to the Ford Explorer, that the Schianos owned before the GMC Acadia, the GMC Acadia was using twice as much gas as the Explorer.  The Acadia required two full tanks of gas per week whereas the Ford Explorer required one full tank.  The miles driven per week did not change from the time the Schianos owned their Ford Explorer to the time they leased the GMC Acadia.

11.       Even the gas attendant of the gas station from where the Schianos often purchase

gas for their Acadia noticed the difference.  He stated recently, "wow, this truck eats up gas, doesn't it?"

12.     The Schianos noticed the horrible gas mileage associated with the Acadia months before GM notified the Schianos that GM misrepresented the mpg to them when they leased the vehicle.  On May 25, 2016, the Schianos received a notice from GM stating "when you leased your vehicle, the label indicated a combined mpg of 19 (16 city, 23 highway).  In fact the correct EPA-estimated combined mpg is 17 (15 city, 22 highway)."   Attached hereto as **Exhibit A** is a copy of the notice GM sent to the Schianos that is incorporated into this Complaint.

13.     The notice then stated that GM was willing to reimburse the Schianos $900 by way of a debit card for the estimated extra gas the Schianos would have to purchase based on the correct combined mpg of their vehicle.  This estimate of $900 was calculated using a gas price of $3.00/gallon over the course of the 36 month lease.  However, based on the Schiano's actual experience with their 2016 Acadia, $900 will not fully compensate them for the additional gas they will need to purchase as a result of GM's misrepresentation.  Further, the notice did not offer to compensate the Schianos for the reduced value of the vehicle which effects its lease price.

14.     Had those advertisements and window sticker or any other materials disclosed that Plaintiffs would not receive such favorable mileage, the Plaintiffs would not have leased the Acadia or paid as much in monthly lease payments for the Vehicle.

15.     Defendant GM is a limited liability company organized under Delaware law with its principal office located at 300 Renaissance Center, Detroit, Michigan 48265. Defendant designs, tests, manufactures, distributes, warrants, sells, and leases various vehicles under several prominent brand names, including, but not limited to, Chevrolet, Buick, GMC, GM, and Pontiac in this district and throughout the United States.

### III.    JURISDICTION AND VENUE

16.    This court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because at least one class member is of diverse citizenship from the Defendant; there are more than 100 Class Members; and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. This Court also has personal jurisdiction over the parties because Defendant conducts substantial business in New York, has had systematic and continuous contacts with New York, and has agents and representatives that can be found in this State.

17.    Venue is proper in this District under 28 U.S.C. § 1391 because, a substantial part of the events giving rise to the claims occurred and emanated out of this District, and Defendant's conduct has injured Class and Subclass Members residing in this District. Accordingly, this Court has jurisdiction over this action and venue is proper in this Judicial District.

18.    Defendant is amenable to personal jurisdiction in New York. A substantial portion of the wrongdoing alleged in the Complaint took place in New York and Defendant conducts business within the state sufficient to be considered present in New York.

### IV.    FACTUAL ALLEGATIONS

19.    Under regulations issued by the EPA, every new vehicle sold in the United States must have a window sticker (also known as a Monroney sticker) affixed to the window. The window sticker must contain certain essential information such as the vehicle's mpg estimates.

20.    The EPA requires all automakers to use certain standard testing procedures to determine a particular vehicle's mileage estimates that are then displayed on the vehicle's Monroney sticker.

21.     In fact, in 2006, the EPA revised the testing methods used to determine fuel economy ratings (for both city and highway mileage) appearing on the window stickers of all new vehicles.  This revision became effective with 2008 model-year vehicles.

22.     The EPA's revision incorporated several significant changes to the prior testing methods.  First, the tests now include factors such as high speeds, quicker accelerations, air conditioning use, and driving in cold temperatures, which bring the mpg estimates closer to consumers' actual fuel economy.  Second, beginning with the 2011 model year, certain heavier vehicles (such as SUVs and vans up to 10,000 pounds gross vehicle weight) must have fuel economy labels.  Third, the EPA required a change in the design and content of window stickers for vehicles manufactured after September 1, 2007, to allow consumers to more easily compare the fuel economy of different vehicles.

23.     The vehicle manufacturers conduct the mpg tests and transmit the data to the EPA, who certifies the numbers.  The EPA tests approximately 150 to 200 vehicles a year (fifteen percent of all possible vehicle configurations) to ensure that their performance matches the mileage and emissions data submitted to the EPA by automakers.

24.     Defendant knew or should have known their stated fuel economy ratings were uniformly inaccurate across a large segment of vehicles and model years.

25.     Fuel mileage is one of the most important factors in a consumer's decision to purchase or lease a new car.

26.     Car companies, such as Defendant, widely tout their vehicles as having superior gas mileage estimates and fuel economy ratings in advertisements, especially where their vehicles allegedly achieve better fuel economy ratings than their competitors.

27.     At all times, GM possessed vastly superior information to that of consumers about

the inaccurate results of their fuel economy testing and the corresponding increase in mpg ratings provided to consumers through advertisements and the Class Vehicles' window stickers.

28.     One of the factors consumers consider in purchasing or leasing a vehicle is gas mileage estimates and fuel economy ratings contained on vehicle windows stickers and featured in manufacturers' websites, brochures and advertisements, to help them make informed decisions about the vehicles they purchase or lease.

29.     Plaintiffs considered their respective vehicle's gas mileage estimates and/or fuel economy ratings in deciding to purchase or lease their vehicles.

30.     Upon information and belief, Defendant has sold or leased at least 135,000 Class Vehicles knowingly containing inaccurate Monroney stickers, which overstated the estimated gas mileage and fuel economy rating information on the vehicle.

31.     However, although GM has only admitted to overstating the fuel economy on certain 2016 GM vehicles, a recent Consumer Reports article asserts that GM may have been misstating the fuel economy on these vehicles for years.  According to consumer reports:

> It's possible that the stated figures for the Enclave, Traverse, Acadia, and also the discontinued Saturn Outlook may have been incorrect for years.
> …
>
> The Enclave, Traverse, and Acadia are essentially triplets—all are built on the same platform and share the same powertrain—and the 2016 models are not significant refreshes. After the company updates the stickers for these 2016 crossover vehicles, the prior models from 2007 to 2015 will now all have better stated fuel economy numbers than the new vehicles in GM's dealerships. It seems unlikely that the company would change the powertrain on these carryover models so late in their model cycles in a way that would cause a dramatic, negative impact on fuel economy. When asked about this directly, GM declined to give a specific answer regarding any substantial changes to these vehicles.

Attached hereto as **Exhibit B** is a copy of the May 16, 2016 Consumer Reports Article that is incorporated into this Complaint.

32.     In fact, Consumer Reports tested the fuel economy of prior years' GM vehicles and found that GM overstated the fuel economy on many of its vehicles by as much as 3 MPG. Consumer reports explained:

> Consumer Reports has previously tested the real-world fuel economy of three prior models of these GM crossovers and found that they performed below their official EPA numbers (data below). While it's not unusual for our test findings to vary from the EPA figures, the difference is usually just one or two mpg. In Consumer Reports testing, we saw up to a three mpg difference from the EPA figures.

## Fuel Economy Comparison

|  | Consumer Reports overall mpg | EPA overall mpg |
|---|---|---|
| 2007 Saturn Outlook XR AWD | 16 | 18 |
| 2008 Buick Enclave CXL AWD | 15 | 18 |
| 2009 Chevrolet Traverse LT AWD | 16 | 19 |

*See* **Exhibit B**.

33.     Plaintiffs leased a Class Vehicle based on their reasonable expectations that the vehicle would perform consistent with the estimated gas mileage and fuel economy rating information contained on the window sticker and has been harmed by the inability of their vehicles to achieve the advertised estimates.

## V.     CLASS ACTION ALLEGATIONS

34.     Plaintiffs bring this action on behalf of themselves and all other persons similarly

situated, pursuant to Rule 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure.

35.     Plaintiffs seek certification of a Class and Subclass, initially defined as follows:

**Class (the "Nationwide Class"):**

All persons or entities in the United States who are current or former purchasers or lessees of the Class Vehicles.

**Subclass (the "New York Class")**:

All persons or entities in New York who are current or former purchasers or lessees of the Class Vehicles.

36.     Specifically excluded from the Class and Subclass are:  (a) Defendant and any entity in which Defendant has a controlling interest, (b) any of Defendant's officers, directors, employees, agents, representatives, and their family members, and officers, directors, employees, agents, representatives, and their family members of any entity in which Defendants have a controlling interest, and (c) any judicial officers involved in this matter.

37.     **Numerosity/Impracticability of Joinder**:  The members of the Class and Subclass are so numerous that joinder of all members would be impracticable.  The proposed Class and Subclass includes tens of thousands of members.  At least tens of thousands of Class Vehicles have been sold.  The Class and Subclass are composed of an easily ascertainable,  self-identifying set of individuals and entities that own or leased the Class Vehicles.  The precise number of Class and Subclass Members can be ascertained by reviewing documents in Defendant's possession, custody, and control.

38.     Plaintiffs are members of the Class and Subclass.

39.     **Commonality and Predominance**:  There are common questions of law and fact that predominate over any questions affecting only individual members of the Class and Subclass.   These common legal and factual questions, include, but are not limited to, the following:

a. Whether Defendant violated federal law with their testing methods or presentation of EPA fuel ratings;

b. Whether the Class Vehicles' stated EPA fuel economy rating was inaccurate;

c. Whether Defendant advertised, marketed and sold the Class Vehicles using false and overstated gas mileage and fuel economy rating information;

d. Whether the Class Vehicles' actual, inferior gas mileage estimates and fuel economy ratings reduced the value of the Class Vehicles;

e. Whether Defendant knew or should have known that the Class Vehicles' fuel economy ratings were overstated or exaggerated prior to EPA testing;

f. Whether Defendant breached their contracts with Plaintiff and the Class Members;

g. Whether Defendant violated New York's General Business Law § 349;

h. Whether Defendant breached its express warranties made to Plaintiffs and the Class Members;

i. Whether Defendant was unjustly enriched by their deceptive practices; and

j. Whether, by the misconduct set forth herein, Defendant breached its duty of good faith and fair dealing.

40. **Typicality**: Plaintiffs' claims are typical of the claims of the members of the Class and Subclass. Plaintiffs and all Class and Subclass Members have been injured by the same wrongful practices by Defendant. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the Class and Subclass Members and are based on the same legal and remedial theories. Indeed, Plaintiffs and all members of the Class and Subclass purchased or leased a subject GM that was marketed and sold to them with false estimated gas mileage and fuel economy rating information.

41. **Adequacy**: Plaintiffs will fully and adequately assert and protect the interests of the Class and Subclass Members, and have retained class counsel who are experienced and qualified in prosecuting class actions. Neither Plaintiffs nor their attorneys have any interests

that are contrary to or conflicting with the Class and Subclass Members.

42.     **Superiority**:  A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all Class and Subclass Members is not economically feasible and is procedurally impracticable.  While the aggregate damages sustained by the Class and Subclass Members are in the millions of dollars, and are no less than five million dollars upon information and belief, the individual damages incurred by each Class and Subclass Member resulting from GM's wrongful conduct are too small to warrant the expense of individual suits.  The likelihood of individual Class and Subclass Members prosecuting their own separate claims is remote, and, even if every Class and Subclass Member could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases.  Class and Subclass Members do not have a significant interest in individually controlling the prosecution of separate actions, and individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all of the parties and to the court system because of multiple trials of the same factual and legal issues.  Plaintiffs know of no unusual difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

43.     In addition, Defendant has acted or refused to act on grounds generally applicable to the Class and Subclass Members and, as such, final injunctive relief or corresponding declaratory relief with regard to the members of the Class and Subclass as a whole is appropriate.

## VI.     CLAIMS FOR RELIEF

### FIRST COUNT (On Behalf of Plaintiffs, Class and Subclass Members)
### (Breach of Contract)

44.     Plaintiffs incorporate by reference the allegations contained in the preceding

paragraphs of this Complaint.

45.     Defendant, through the Class Vehicles' window stickers, and Defendant's advertisements, brochures, website and other marketing materials, made uniform offers regarding the quality and capabilities of the vehicles subject herein, including that they meet represented gas mileage estimate levels and achieved the represented fuel economy ratings.

46.     By purchasing or leasing the Class Vehicles, Plaintiffs and members of the Class accepted Defendant's offer and paid the consideration of the purchase or lease price.

47.     Defendant, Plaintiffs and the Class and Subclass Members each had the legal capacity to enter into the purchase or lease contracts.

48.     Defendant breached the contracts by not upholding their end of the bargain by providing a product that does not meet the represented gas mileage estimate levels or to achieve the represented fuel economy ratings.

49.     As a direct and proximate cause of Defendant's breach, Plaintiffs and the Class and Subclass Members were damaged through higher fuels costs and loss of resale value in the amount to be proven at trial.

### SECOND COUNT (On Behalf of Plaintiffs and Subclass Members (Violations of New York's General Business Law, § 349 *et seq.*)

50.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

51.     Plaintiffs bring this cause of action on behalf of themselves and on behalf of members of the Subclass against Defendant.  Plaintiffs bring this action pursuant to New York General Business Law ("GBL") § 349.

52.     Defendant engaged in consumer oriented, commercial conduct by selling and

advertising the subject vehicles.

53.     Defendant misrepresented and omitted material information regarding the Class Vehicles by failing to disclose to Plaintiffs and Subclass Members the fact that the Class Vehicles' fuel-economy ratings are false and inflated.

54.     For instance, Defendant knew and intended for consumers to rely on its material misrepresentations and omissions with regard to the fuel-economy ratings when purchasing their vehicles, especially in light of their express claims.

55.     Plaintiffs and other Subclass Members relied on their fraudulent misrepresentations in making the decision to purchase their vehicles.  As a result of Defendant's misrepresentations, Plaintiffs agreed to lease the 2016 GMC Acadia at a monthly lease rate of $512.00 on a vehicle which advertised false and inflated fuel-economy ratings as well as false and deflated estimated annual fuel costs.

56.     Defendant has exclusive knowledge of the exaggerated estimated gas mileage and fuel economy rating information.  Plaintiffs and/or Subclass Members could not, in the exercise of reasonable diligence, have discovered this information independently prior to purchase or lease.

57.     Defendant's misrepresentations and concealment of facts constitute unconscionable commercial practices, deception, fraud, false pretenses, misrepresentation, and/or knowing concealment, suppression, or omission in connection with the sale and advertisement of the Class Vehicles, in violation of New York GBL § 349.

58.     GM's conduct was objectively deceptive and had the capacity to deceive reasonable consumers under the circumstances.  This fact would influence a reasonable consumer's choice of action during the purchase or lease of their vehicles.

59.     Had GM disclosed all material information regarding the exaggerated estimated

gas mileage and fuel economy rating information, Plaintiffs and other members of the Subclass would not have purchased or leased the Class Vehicles, or they would have paid less for them.

60.     GM's conduct had an impact on the public interest because the acts were part of a generalized course of conduct affecting numerous consumers.

61.     As a direct and proximate result of Defendant's violations of GBL § 349, Plaintiffs and Subclass Members have suffered damages, for which they are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees.

### THIRD COUNT (On Behalf of Plaintiffs, Class and Subclass Members) (Fraud)

62.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

63.     Plaintiffs bring this cause of action on behalf of themselves and members of the Class and Subclass against Defendant.

64.     The misrepresentations, nondisclosure, and/or concealment of material facts made by Defendant to Plaintiffs and the members of the Class and Subclass, as set forth above, were known, or through reasonable care should have been known, by Defendant to be false and material and were intended to mislead Plaintiffs and the members of the Class and Subclass.

65.     Plaintiffs and the Class and Subclass were actually misled and deceived and were induced by Defendant to purchase or lease the Class Vehicles which they would not otherwise have purchased or leased, or would have paid substantially less for the vehicle or agreed to pay a lower monthly lease payment.

66.     Defendant's misrepresentations, concealments and omissions concerning the fuel-economy of the Class Vehicles were material in Plaintiffs' and other Class and Subclass Members' decisions to purchase their vehicles.  In fact, the representations and omissions to the Class and

Subclass Members were so fundamental to Plaintiffs' and Class and Subclass Members' decision making process that they would not have otherwise purchased or leased, or would have paid substantially less for the vehicle or agreed to pay a lower monthly lease payment.

67.    Plaintiffs and the Class and Subclass suffered the damage described in this complaint as a proximate result thereof.

68.    As a direct and proximate result of Defendant's fraudulent conduct, Plaintiffs and Class and Subclass Members have suffered damages, for which they are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees.

**FOURTH COUNT (On Behalf of Plaintiffs, Class and Subclass Members)**
**(Breach of Implied Warranties)**

69.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

70.    GM each sold and promoted its vehicles as having certain EPA fuel economy ratings, and placed those vehicles into the stream of commerce.  Defendant knew or had reason to know of consumers' particular purpose for purchasing the vehicles, which were being purchased or leased because of claims of certain, low gas mileage, and Defendant impliedly warranted that the vehicles were of merchantable quality.

71.    Plaintiffs and the Class and Subclass Members relied on Defendant's misrepresentations by purchasing the Class Vehicles.

72.    Defendant knew or had reason to know that Plaintiffs and the Class and Subclass Members were influenced to purchase or lease their vehicles through Defendant's expertise, skill, judgment and knowledge in furnishing the products for their intended use.

73.    The Class Vehicles were not fit for their particular intended use because their EPA fuel economy ratings were not as promoted and advertised.

74.     Defendant's actions, as complained of herein, breached their implied warranty that the vehicles were of merchantable quality, in violation of the Uniform Commercial Code (UCC § 2-314 and § 2-3154) and the common law of this State, as well as the common law and statutory laws of the other states.

75.     Plaintiffs and the Class and Subclass Members have incurred damage as described herein as a direct and proximate result of the failure of Defendant to honor their implied warranty. In particular, Plaintiffs and Class and Subclass Members would not have purchased or leased the vehicle had they known the truth about the overstatement of its fuel ratings, nor would they have suffered the collateral effects and damages associated with these misstatements.

**FIFTH COUNT (On Behalf of Plaintiffs, Class and Subclass Members)**
**(Breach of Express Warranties)**

76.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

77.     Defendant, through the Class Vehicles' window sticker, advertisements, brochures, website and other marketing materials, made representations to Plaintiffs and members of the class about the Class Vehicles' gas mileage and fuel economy ratings.  Thus, Defendant expressly warranted in its advertisements, brochures and notices that the Class Vehicles experience specific mpgs.

78.     These representations were aimed at consumers, including Plaintiffs and members of the class to entice them to purchase or lease the Class Vehicles.

79.     Defendant's representations were part of the basis of the bargain because fuel economy is one of the most important considerations facing vehicle purchasers or lessees and Plaintiffs and Class and Subclass Members purchased or leased the Class Vehicles based on the reasonable expectation that the Class Vehicles would achieve the represented gas mileage and fuel

economy ratings.

80.     Because the Class Vehicles cannot achieve the fuel efficiency levels Defendant represented to them to have, Plaintiffs and members of the Class and Subclass have been injured through higher fuel costs and loss of resale value of their vehicles, and these injuries were directly and proximately caused by Defendant's misrepresentations.

81.     As a result of GM's breach of warranty, Plaintiffs and the Class and Subclass Members have suffered damage in an amount to be determined at trial.

**SIXTH COUNT (On Behalf of Plaintiffs, Class and Subclass Members)**
**(Negligent Misrepresentation)**

82.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

83.     Defendant made fuel economy representations to Plaintiffs and members of the Class and Subclass that were not true.  Defendant's statements were material, false, deceptive, and misleading and omitted material facts necessary to make the statements not misleading; such material misrepresentations and omissions were the result of Defendant's negligence.

84.     Defendant owed a duty to Plaintiffs and members of the Class and Subclass to exercise reasonable care in making representations about the Class Vehicles.

85.     Plaintiffs and the Class and Subclass Members relied (or should be presumed to have relied) on Defendant's material representations and omissions in purchasing or leasing the Class Vehicles.  As a result of their justifiable reliance, Plaintiffs and members of the Class and Subclass were induced to and did purchase or lease their vehicles.  Plaintiffs' reliance and the Class and Subclass Members' reliance were reasonably foreseeable by Defendant (and in fact, that is why the Defendant made the misrepresentations that they did).

86.     As a direct and proximate result of the negligent misrepresentations made by

Defendant, Plaintiffs and the Class and Subclass Members have been damaged.

**SEVENTH COUNT (On Behalf of Plaintiffs, Class and Subclass Members)**
**(Unjust Enrichment)**

87.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

88.     Defendant has been unjustly enriched and received an economic benefit by the sale or lease of the Class Vehicles herein to Plaintiffs and the Class and Subclass Members.

89.     Plaintiffs seek to recover for Defendant's unjust enrichment.

90.     Plaintiffs and the Class and Subclass Members conferred a benefit on Defendant, but Defendant failed to disclose their knowledge that Plaintiffs did not receive what they paid for and misled Plaintiffs and the Class and Subclass Members regarding the misstatements of their touted EPA fuel economy ratings while profiting from this deception.

91.     The circumstances are such that it would be inequitable, unconscionable, and unjust to permit Defendant to retain the benefit of these profits that they have unfairly obtained from Plaintiffs and the Class and Subclass Members.

92.     Plaintiffs and the Class and Subclass Members, having been injured by Defendant's conduct, are entitled to restitution or disgorgement of profits as a result of the unjust enrichment of Defendant to their detriment.

**EIGHTH COUNT (On Behalf of Plaintiffs, Class and Subclass Members)**
**(Breach of the Duty of Good Faith and Fair Dealing)**

93.     Plaintiffs repeat and realleges the allegations contained in the preceding paragraphs as if fully set forth herein.

94.     Every contract in New York contains an implied covenant of good faith and fair dealing.  The implied covenant of good faith and fair dealing is an independent duty and may be

breached even if there is no breach of a contract's express terms.

95.     Defendant breached the covenant of good faith and fair dealing by, *inter alia*, misrepresenting to Plaintiffs and Class and Subclass Members the true gas mileage in the Class Vehicles, and failing to fully and properly correct this misrepresentation prior to the time of purchase or lease.

96.     Defendant acted in bad faith and/or with a malicious motive to deny Plaintiffs and Class and Subclass Members some benefit of the bargain originally intended by the parties, thereby causing them injuries in an amount to be determined at trial.

### VII.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs on behalf of themselves and the Class and Subclass Members, pray for judgment against GM granting the following relief:

1.     An order certifying this case as a class action and appointing Plaintiffs to represent the Class and Subclass Members and Plaintiffs' counsel as Class counsel;

2.     All recoverable compensatory and other damages sustained by Plaintiffs and the Class and Subclass Members;

3.     Restitution and disgorgement of all amounts obtained by GM as a result of their misconduct, together with interest thereon from the date of payment, to the victims of such violations;

4.     Permitting Plaintiffs and the Class and Subclass Members to rescind their vehicle purchase or lease transactions;

5.     Actual, treble, and/or statutory damages for injuries suffered by Plaintiffs and the Class and Subclass Members in the maximum amount permitted by applicable law;

6.     Statutory pre-judgment and post-judgment interest on the Class and Subclass

damages;

7.      Payment of reasonable attorneys' fees and costs as may be allowable under

applicable law; and

8.      Such other relief as the Court may deem just and proper.

## VII.    DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all causes of action so triable.

DATED:  June 21, 2016

### POULOS LOPICCOLO PC

By:   */s/ Joseph LoPiccolo*
        Joseph LoPiccolo
        John N. Poulos

1305 South Roller Road
Ocean, NJ 07712
732-757-0165
lopiccolo@pllawfirm.com
poulos@pllawfirm.com

Diane E. Sammons
Bruce H. Nagel (*Pro Hac Vice* Admission to be sought)
Randee Mattloff (*Pro Hac Vice* Admission to be sought)
**NAGEL RICE, LLP**
103 Eisenhower Parkway
Roseland, New Jersey 07068
973-618-0400
rmatloff@nagelrice.com
bnagel@nagelrice.com

# EXHIBIT A



WE ARE PROFESSIONAL GRADE

Brian Schiano
3451 4th St.
Oceanside, NY 11572
Your 2016 GMC Acadia
VIN: ▮▮▮▮▮▮
PIN: ▮▮▮▮▮▮
gmc.com/fueleconomyoffer

May 25, 2016

Dear Brian,

It's our goal to provide you with vehicles designed, engineered and built to a higher standard. Our goal is also to create an environment where our customers are at the center of every decision we make.

That's why we want to let you know that we have discovered an unintentional error in the EPA fuel economy estimates on the window label of your 2016 GMC Acadia. When you leased your vehicle, the label indicated a combined MPG of 19 (16 city, 23 highway). In fact, the correct EPA-estimated combined MPG is 17 (15 city, 22 highway).

We apologize for this mistake and would like to reimburse you for the expected increased incremental fuel cost for the term of the lease on your vehicle. Based on the term of your lease compared to the five years of ownership period used by the EPA calculation on your window label, the amount of your reimbursement is $900 at 15,000 miles per year and gas prices at $3.00/gallon. We would like to offer you that amount via a debit card. Please take action no later than August 1, 2016. For details about this offer, please see the next page.

You may redeem your special offer online at **gmc.com/fueleconomyoffer**. You'll need your VIN and a PIN (they're printed on both pages of this letter, for your convenience). Once you log in, you will be asked to agree to certain terms and conditions, including a waiver of claims related to this error.

Additionally, in a few weeks, we will separately mail you a new window label with the corrected EPA-estimated fuel economy for your vehicle.

We appreciate your business and will continue to earn your trust and loyalty by offering a Professional Grade lineup of trucks, SUVs and crossovers.

Regards,

Duncan Aldred
U.S. Vice President, GMC



WE ARE PROFESSIONAL GRADE

Brian Schiano
3451 4th St.
Oceanside, NY 11572
Your: 2016 GMC Acadia
VIN: ██████████
PIN: ██████████
gmc.com/fueleconomyoffer

## $900 DEBIT CARD

You will receive your debit card by mail within 4 weeks.

To redeem your offer, please visit
## gmc.com/fueleconomyoffer
Please take action no later than August 1, 2016.

Your Vehicle: 2016 GMC Acadia
VIN: ██████████
PIN: ██████████
(These numbers will be required to log into the customer website.)

Please contact GMC's Customer Relations Center at 1-800-462-8782 if you have any questions.

# EXHIBIT B

# General Motors' Fuel Economy Discrepancies Could Extend to 2 Million Vehicles

## GM may have overstated mpg on Buick, Chevrolet, GMC, and Saturn SUVs

By Jeff S. Bartlett

May 16, 2016

General Motors issued a stop-sale order last week to its dealers of 2016 Buick Enclave, Chevrolet Traverse, and GMC Acadia SUVs, calling for those models not to be sold until a correction could be made to the vehicle's window stickers. The concern is that the stickers overstate fuel economy by 1 to 2 mpg. A GM spokesman told Consumer Reports that the automaker is in the process of updating those figures in advertising materials, marketing, and websites, in addition to the window stickers on about 60,000 crossovers currently on dealer lots.

However, when Consumer Reports looked at our own historical test data next to fuel economy numbers from the Environmental Protection Agency and GM's own claims, it seemed like there might be more to this story. It's possible that the stated figures for the Enclave, Traverse, Acadia, and also the discontinued Saturn Outlook may have been incorrect for years.

For example, the EPA's site fueleconomy.gov shows the combined city/highway fuel economy for the 2015 Acadia AWD at 19 mpg—that's two mpg *better* than the revised numbers on the 2016 model. When asked whether the discrepancy extends to earlier models, a GM spokesman

responded via email, saying that the company, "...has checked and found no other models or model years were affected."



GMC Acadia comparison on fueleconomy.gov

The Enclave, Traverse, and Acadia are essentially triplets—all are built on the same platform and share the same powertrain—and the 2016 models are not significant refreshes. After the company updates the stickers for these 2016 crossover vehicles, the prior models from 2007 to 2015 will now all have better stated fuel economy numbers than the new vehicles in GM's dealerships. It seems unlikely that the company would change the powertrain on these carryover models so late in their model cycles in a way that would cause a dramatic, negative impact on fuel economy. When asked about this directly, GM declined to give a specific answer regarding any substantial changes to these vehicles.

Consumer Reports has previously tested the real-world fuel economy of three prior models of these GM crossovers and found that they performed below their official EPA numbers (data below). While it's not unusual for our test findings to vary from the EPA figures, the difference is usually just one or two mpg. In Consumer Reports testing, we saw up to a three mpg difference from the EPA figures.

# Fuel Economy Comparison

|  | Consumer Reports overall mpg | EPA overall mpg |
|---|---|---|
| **2007 Saturn Outlook XR AWD** | 16 | 18 |
| **2008 Buick Enclave CXL AWD** | 15 | 18 |
| **2009 Chevrolet Traverse LT AWD** | 16 | 19 |

We reached out to the EPA to see if the agency is investigating this possibility. We had not yet received a response.

If this problem extends to the full breadth of this model generation, it could potentially impact more than 2 million crossovers sold in the U.S. over the past decade.

Using the EPA's calculator on fueleconomy.gov, we found that a decline from 19 mpg overall to 17 mpg would cost an average consumer about $200 per year. Compensating owners for not delivering the expected fuel economy could be quite expensive.

Hyundai found itself in a similar situation in 2012 when an EPA spot check discovered that some 2012 and 2013 Hyundai and Kia models made exaggerated mpg claims. The automaker issued debit cards to customers to pay for the estimated additional fuel costs based on the actual miles driven, plus 15 percent.

In GM's case, given the time in service of many of these vehicles, a misstatement of fuel economy could have cost many customers $1,000 or more by now. Consumer Reports will continue to follow this story as it develops.

---

© 2006 - 2016 Consumer Reports